1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES  DISTRICT COURT

## Northern District of California

### San Francisco Division

WILLIAM HAMILTON,

          Plaintiffs,

  v.

RADIOSHACK CORPORATION,

          Defendant.

_____/

No. C 11-00888 LB

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING MOTION TO STRIKE

[ECF Nos. 95, 109]

## I.  INTRODUCTION

In June 2010, after working at RadioShack Corporation ("RadioShack") for more than 27 years, William Hamilton was terminated by his supervisor, Donna Ocampo, purportedly for speaking insubordinately to and around her on two occasions.  Hamilton claims that Ocampo actually terminated his employment because of his age and because he complained to RadioShack's human resources department following an argument between Hamilton and Basem Aybef, Ocampo's one-time supervisor.  Hamilton brought suit alleging four causes of action: (1) age discrimination under the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12900 *et seq.*; (2) retaliation under the FEHA; (3) failure to prevent discrimination and retaliation under the FEHA; and (4) wrongful termination in violation of public policy.  Compl., ECF No. 1 at 10-12, ¶¶ 8-28[1].

---

[1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-generated page numbers at the top of the document.

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Hamilton seeks back pay, front pay, and other monetary relief, punitive damages, interest, fees, and

2  costs.  *See id.* at 12.  Now before the court is RadioShack's motion for summary judgment on all of

3  Hamilton's claims.[2]  *See* Def.'s Mot. Supp. Mot. For Summ. J. or Summ. Adjudication (Mot.), ECF

4  No. 95.  For the reasons stated below the court GRANTS RadioShack's motion with respect to

5  Hamilton's punitive damages claim based on Aybef's conduct and ratification and DENIES it in all

6  other respects.

## II.  BACKGROUND

**A.  Factual Background**

9      RadioShack is a national electronics retailer headquartered in Fort Worth, Texas.  *See* Updated

10  Joint Statement of Material Facts ("JMF"), ECF No. 96 at 6; Mot., ECF No. 95 at 9.  Plaintiff

11  William Hamilton is a California resident who worked for RadioShack for 27 years until he was

12  terminated on June 10, 2010.  *See* JMF, ECF No. 96 at 3, 5.  When he was terminated, Hamilton was

13  57 years old and worked as the store manager of RadioShack store number 13893, located on Pine

14  Street in San Francisco, California.  *Id.*  RadioShack groups its stores into districts.  *See id.* at 3.  The

15  Pine Street store was part of RadioShack's San Francisco district.  *Id.*

16      In March 2010, Donna Ocampo became the District Manager ("DM") of RadioShack's San

17

18      [2]  RadioShack also moves to strike Hamilton's Separate Statement of Disputed Facts, ECF
No. 105, or in the alternative for permission to file a responsive pleading.  *See* Mot. to Strike, ECF
19  No. 109.  In response, Hamilton argues that its Separate Statement of Disputed Facts is not barred by
any applicable rules and is intended "to aid the Court in sorting through the evidence."  Opp'n to
20  Mot. to Strike, ECF No. 111 at 2.

21

22      Hamilton's separate statement of disputed facts seems to have been an attempt to circumvent
the court's order denying Hamilton's request for increased page limits.  Civil Local Rule 7-4(a)(5)
23  requires parties to "cite pertinent authorities" in their briefs.  It does not permit parties to cite indices
of those authorities.  Hamilton's separate statement is simply an index that, far from aiding the court,
24  forces it to refer to another document in order to locate much of Hamilton's primary authority.  This
cumbersome process saved Hamilton a significant amount of briefing space.  The court finds
25  Hamilton's Separate Statement improper, and the court likely would strike similar filings in the
future.  Nonetheless, it will not do so here under circumstances that include an expedited briefing
26  schedule (at the time) and Hamilton's use of only 22 out of 25 possible pages.  The court considered
any prejudice to RadioShack but finds none (and reaches this result in part to aid the court's faster
27  access to disputed facts).  Accordingly, the court denies RadioShack's motion to strike.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

Francisco district, making her Hamilton's direct supervisor. *Id.  See* JMF, ECF No. 96 at 4.  When

she was promoted, Ocampo's supervisor was Regional Sales Director ("RSD") Todd Schrader. *See

id.* at 4-5.  Shortly after Ocampo was made district manager, Basem Aybef was named the temporary

RSD for four districts in Northern California, including the San Francisco district. *Id.* at 4.  While

he was the RSD for the San Francisco district, Aybef was Ocampo's supervisor. *Id.*  Aybef held that

position for about six weeks, from early April 2010 to May 21, 2010, when he relocated to Texas.

*Id.* at 4-5; Schrader Decl. ¶ 3, ECF No. 97-3 at 3.  After Aybef left, Todd Schrader resumed his

duties as Ocampo's supervisor and the RSD for the San Francisco district. *Id.* at 5.

The parties' dispute arises, in part, out of an argument between Hamilton and Aybef at the Pine

Street store.  On April 20, 2010, Ocampo and Aybef visited Hamilton's store. *Id.* at 4.  Ocampo

testified that she brought Aybef to see Hamilton's store because based on previous experience, she

expected it would look "fantastic" and be "clean and organized."  Ocampo Dep. 131:12, 21, ECF

No. 104-1 at 26.  During the visit, Aybef began to criticize Hamilton for the condition of the store.

*See* Mot., ECF No. 95 at 11; Opp'n, ECF No. 103 at 6.[3]  Among other things, Aybef criticized the

fact that there were open pegs where some merchandise should have hung and that some items were

missing price tags. *See* Mot., ECF No. 95 at 11; Hamilton Dep. 132:7-136:6, ECF No. 97-9 at 60-

63.  Hamilton disagreed with Aybef's criticisms and repeatedly tried to defend himself.  Mot., ECF

No. 95 at 11; Opp'n, ECF No. 103 at 6.  Hamilton and Savannah Breese (a sales associate at the Pine

Street store) testified that Aybef's tone of voice became aggressive.  Breese Dep. at 114:10-125:8,

ECF No. 104-3 at 33-44; Hamilton Dep. at 137:18-20.  Hamilton claims that when he tried to

explain the condition of the store, Aybef poked his finger at Hamilton's face in an angry manner and

became more heated. *See* Hamilton Dep. at 137:9-20, ECF No. 104-3 at 8; Breese Dep. at 114:10-

125:8, ECF No. 104-3 at 33-44.  Ocampo disputes this account, testifying that Aybef never raised

his voice on the sales floor and never put his finger in Hamilton's face.  Ocampo Dep. 133:16-

_____

[3]  The parties agreed to only limited undisputed facts. *See* JMF, ECF No. 96.  Their moving
papers, however, reveal that many more facts are not reasonably in dispute.  To the extent the
parties' briefs rely on identical facts, the court treats them as undisputed and cites only to the parties'
moving papers.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    134:25, ECF No. 104-1 at 27-28.  Hamilton and Ocampo testified that during the argument, Aybef

2    said that if Hamilton said one more word, he would fire Hamilton for insubordination.  Mot., ECF

3    No. 95 at 12 (citing Hamilton Dep. at 137:2-20; 138:11-19; 141:14-24; Ocampo Dep. 141:25-142:9).

4         The discussion became loud and eventually, Aybef, Ocampo, and Hamilton went to the back

5    room of the store, away from customers and other employees.  *See* Mot., ECF No. 95 at 11-12;

6    Opp'n, ECF No. 103 at 7.  In the back room, the conversation became heated.  *See* Mot., ECF No.

7    95 at 12; Opp'n, ECF No. 103 at 7.  After moving to the store's back room, Hamilton states that

8    Aybef asked him how long he had been with RadioShack.  Hamilton Dep. 150:7-151:3.  Hamilton

9    testified that when he told Aybef that he had been the company for 27 years, Aybef said, "27

10   years, huh. . . . That's a long time to be working anywhere. . . . You might be tired.  It might be time

11   for you to hang it up."  Hamilton Dep. 150:22-151:1.  Aybef was 51 at the time and had been with

12   RadioShack for 25 years.  Aybef Decl., ¶ 2.  Aybef, Hamilton, and Ocampo agreed that Aybef said

13   something to Hamilton along the lines of, if you say one more word, you could be fired immediately

14   for insubordination.  Hamilton Dep.137-38; Ocampo Dep. 141-42; Aybef Dep. 135-36; Ocampo

15   Decl., ¶ 6.

16        Ocampo testified that just before leaving the store, Aybef told Hamilton that if it here up to him,

17   he would terminate Hamilton, but that he would leave the decision to Ocampo.  Ocampo Dep.

18   224:22-225:3, ECF No. 104-1 at 38-39.  Ocampo decided not to terminate Hamilton at that time;

19   instead she prepared a disciplinary Corrective Action Record ("CAR") documenting what she

20   perceived as Hamilton's insubordinate conduct.  Hamilton Dep. 190:25-191:5, ECF No. 97-9 at 91-

21   92; Ocampo Dep. 305:19-20, ECF No. 97-10 at 88.  Eventually, Aybef and Ocampo left the store.

22   *See* Mot., ECF No. 95 at 12; Opp'n, ECF No. 103 at 7.  Hamilton never heard from or saw Aybef

23   again.  JMF, ECF No. 96 at 5.

24        On April 21, 2010, Hamilton called RadioShack's Human Resources department and left a

25   message stating that he was involved in an incident with Aybef and needed to speak with a

26   representative as soon as possible.  Mot., ECF No. 95 at 13; Hamilton Dep. 197:24-199:16.  Aybef

27   also called RadioShack's Human Resources Department on April 21 and spoke with Shaan Smith.

28   Aybef Dep. 171:23-174:1, ECF No. 104-3 at 55-58.  Aybef called Human Resources, though he was

UNITED STATES DISTRICT COURT
For the Northern District of California

1   not aware that Hamilton had contacted them.  *Id.*  Instead, Aybef testified that he wanted to give his

2   account of the incident in Hamilton's store in case Hamilton called to complain about him.  *Id.*

3       Also on April 21, 2010, Ocampo sent Aybef a draft of the CAR she intended to issue to

4   Hamilton in response to Hamilton's allegedly unprofessional conduct and the failings that Aybef and

5   Ocampo had observed in the store. *See* Kochan Decl. Ex. 12[4], ECF No. 104-6 at 22; Hamilton Dep.

6   Ex. 2, ECF No. 97-10 at 30.

7       Later on April 21, Ocampo met with Hamilton and presented the CAR to him.  JMF, ECF No. 96

8   at 5.  Ocampo claims that Hamilton refused to sign the CAR she presented to him.  Ocampo Dep.

9   99:16-22, ECF No. 104-1 at 19.  RadioShack produced a version of the CAR dated April 20, 2010

10  (the day before Hamilton's complaint to HR), which Ocampo signed and noted Hamilton's refusal to

11  do the same.  *Id.*; Kochan Decl. Ex. 12, ECF No. 104-6 at 20-21.  Ocampo claims that during that

12  conversation, Hamilton told her that he was in the process of contacting Human Resources about

13  Aybef's conduct.  Ocampo Decl., ECF No. 97-1, ¶ 9.  Hamilton disputes Ocampo's account and

14  testifies that Ocampo gave him a different version of the CAR that was dated April 21, 2010, which

15  he signed and on which he hand wrote his rebuttal to the CAR.  Hamilton Decl., ECF No. 104-5 at

16  44-47.  Hamilton claims that Ocampo's handwriting appears on the April 21 CAR, which is attached

17  to Hamilton's Declaration.  *Id.*; *Id.* Ex. A, ECF No. 104-5 at 46-47; *see also* Krone Decl., Ex. 9

18  (forensic analysis of metadata of April 20 CAR shows a "last saved" date of April 21, 2011 at 10

19  a.m.).

20

21  _____

22      [4]  RadioShack objects to the entirety of Exhibit 12 to the Kochan Declaration, which includes
    the CAR, as not authenticated and hearsay.  *See* Reply at 20.  The Kochan Declaration explains that

23  Exhibit 12 contains "true and correct copies of documents, in sequential order, whose bates numbers
    are preceded by 'RS/Hamilton' which were produced by defendant to plaintiff."  Kochan Decl., ECF

24  No. 104, ¶ 13.  The court overrules RadioShack's objections to the extent they are directed at the
    CAR.  The CAR is not used to prove the truth of the matters asserted and, if it were, would qualify

25  as a statement by an opposing party under Fed. R. Evid. 801(d)(2).  And if RadioShack is actually
    challenging the authenticity of the CAR it produced, the court overrules that unreasonable and

26  vexatious objection.  As RadioShack explains in its reply brief, "there is no dispute that Hamilton
    was given a CAR . . . much less about the substance of the CAR."  Reply at 15.  In the future, the

27  court expects the parties to stipulate to the authenticity of documents where authenticity is not
    reasonably in dispute.

28

1   Shaan Smith testifies that on April 22, 2010, she contacted Ocampo and Hamilton about

2   Hamilton's complaint.  *See* Smith Dep. 131:9-15, 167:19-168:1, ECF No. 97-11 at 61-63.  Smith

3   recorded that Ocampo told her that Hamilton was being argumentative but that Aybef did not act

4   unprofessionally.  Smith Dep. 168:2-19 ECF No. 104-4 at 9.  Ultimately, Smith found that

5   Hamilton's allegations were unsubstantiated.  *Id.* 207:2-13, ECF No. 97-11 at 65.

6   In a May 8, 2010 e-mail message, RadioShack's Area Recruiting Manager, Rodger Rosenberg,

7   asked Ocamp for a "list of SM [store manager] changes that you were expecting including the

8   promotion of TSMs?"  Kochan Decl. Ex. 12, ECF No. 104-6 at 28.  Ocampo responded to

9   Rosenberg's request with a list of store managers that had at the top, "Bill Hamilton- 30 days

10  wireless CAR."  *Id.* (then lists three other folks with CARs, another with a last day 5 days later, 4

11  names under the category TSM, another resignation, and a new hire's training.  *Id.*  Hamilton says

12  that this is evidence that Ocampo planned to fire him as early as May (thereby bolstering his

13  argument that the April 20 incident with Aybef caused his firing).  Opp., ECF No. 103 at 15-16.  He

14  points out that it contradicts her testimony that she did not think of firing him until June 7, 2011.

15  *Id.*; *cf.* Ocampo Dep. 25-26.

16  On June 4, 2010, Ocampo came to Hamilton's store to assist with the launch of a new phone.

17  JMF, ECF No. 96 at 5.[5]  Ocampo testified that she was disappointed with certain aspects of the

18  store's performance that day, which she recorded in a Customer Service Visit Log that she sent to

19  Hamilton on June 5, 2010.  Ocampo Dep. 41-42; Hamilton Dep. 237:17-239:12, ECF No. 97-10 at

20  9-10.  On Monday, June 7, 2010, Ocampo called Hamilton to discuss her observations.  Ocampo

21  Dep. 27:7-17, 37:22-38:5, 39:23-40:8, ECF No. 97-10 at 63, 68-71.  She claims that Hamilton was

22  disrespectful and insubordinate and that he questioned her intelligence.  *Id.*  On June 7, 2010,

23  Ocampo called and e-mailed Todd Schrader and Shaan Smith to inform them about the phone call

24  with Hamilton and that she had decided to terminate Hamilton's employment.  JMF, ECF No. 96 at

25  5.  Schrader approved Ocampo's decision to terminate Hamilton.  *Id.*  Hamilton was terminated on

26  _____

27     [5]  Apparently a May 23, 2010 visit to Hamilton's store by Ocampo and Schrader was
    uneventful.  Hamilton Dep. 218-19, 233-34.  Hamilton did not have any issues with Schrader.  JMF

28  16.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  June 10, 2010.  *Id.*  Aybef was not consulted about Hamilton's termination and was not informed at

2  the time.  *Id.*

3      Ocampo initially replaced Hamilton with an employee who was eight years younger than

4  Hamilton.  Updated Ocampo Decl., ECF No. 97-1, ¶ 23.  Several months later, Ocampo made that

5  employee manager of a different store and promoted a 23-year-old to manager of the Pine Street

6  store.  *See* Ocampo Dep. 431:24-433:10, 444:21-445:2, 468:14-469:1, ECF No. 104-2 at 23-24, 42-

7  43. -19,

8      Ocampo saw Aybef again at RadioShack's fall 2010 leadership conference in Dallas, Texas.

9  JMF 22.  Attendance at the conference was limited to RadioShack's 300 most senior managers.

10  Ocampo Dep. 344:10-345:13.  At the conference, Ocampo spoke with Aybef for just a couple of

11  minutes.  *Id.* 347:11-16.  During their conversation, she mentioned the fact that Hamilton was no

12  longer with RadioShack.  *Id.* 346:9-34:6.  Aybef had not previously learned that Hamilton had been

13  terminated.  Aybef Dep. 87:24-91:15, ECF No. 104-3 at 50-54.

**B.  Procedural Background**

15      Hamilton filed suit in San Francisco County Superior Court on January 20, 2011.  Compl., ECF

16  No. 1 at 8.  On February 24, 2011, RadioShack filed its notice of removal based on diversity

17  jurisdiction and filed its answer the same day.  *See* Notice of Removal, ECF No. 1 at 3 (relying on

18  28 U.S.C. § 1332).  The parties consented to this court's jurisdiction on August 12 2011.  *See* ECF

19  No. 19.  RadioShack filed the pending motion for summary judgment on August 9, 2012.  ECF No.

20  95.

## III.  LEGAL STANDARDS

**A.  Summary Judgment**

23      Summary judgment is proper if the pleadings, the discovery and disclosures on file, and

24  affidavits show that there is no genuine issue as to any material fact and the moving party is entitled

25  to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

26  242, 247-48 (1986).  Material facts are those that may affect the outcome of the case.  *See id.* at 248.

27  A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to

28  return a verdict for the non-moving party.  *See id.* at 248-49.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    The party moving for summary judgment has the initial burden of identifying those portions of

2    the pleadings, discovery and disclosures on file, and affidavits that demonstrate the absence of a

3    genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In

4    considering a motion for summary judgment, the court may not weight the evidence or make

5    credibility determinations, and is required to draw all inferences in a light most favorable to the non-

6    moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

7    When the nonmoving party has the burden of proof at trial, the moving party need point out only

8    "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the

9    moving party meets this initial burden, the non-moving party must go beyond the pleadings and – by

10    its own affidavits or discovery – set forth specific facts showing a genuine issue for trial. *See* Fed.

11    R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

12    U.S. 574, 586-87 (1986). Thus, summary judgment is proper against a non-moving party who "fails

13    to make a showing sufficient to establish the existence of an element essential to that party's case,

14    and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. If the non-

15    moving party does not produce evidence to show a genuine issue of material fact, the moving party

16    is entitled to summary judgment. *See id.* at 323. The mere existence of a "scintilla" of evidence in

17    support of the non-moving party's position is not sufficient. The non-moving party has the burden

18    of establishing sufficient evidence on each element of his case so that the finder of fact could return

19    a verdict for him. *Anderson*, 477 U.S. at 249. To meet this burden, the nonmoving party must come

20    forward with admissible evidence. Fed. R. Civ. P.56(e).

21    **B.  Age Discrimination Under the FEHA**

22    In federal and state employment actions alleging discrimination based on a disparate treatment

23    theory, summary judgment motions are analyzed under the three-step burden-shifting framework

24    established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g., Chuang v.*

25    *University of California Davis*, 225 F.3d 1115, 1123-24 (9th Cir. 2000) (citing *McDonnell Douglas*).

26    This standard has been applied to claims of discrimination based on age. *See Nesbit v. Pepsico, Inc.*,

27    994 F.2d 703, 704 (9th Cir. 1993). First, the plaintiff has the initial burden under the statute of

28    establishing a prima facie case for discrimination. Second, if the plaintiff establishes a prima facie

case, the burden of production shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the employment decision. Third, if the employer offers a nondiscriminatory reason, the burden returns to the plaintiff to show that the articulated reason is a "pretext" for discrimination. *McDonnell*, 411 U.S. at 802–04.

## IV. DISCUSSION

**A. Age Discrimination**

**1. Hamilton Has Established a Prima Facie Case of Age Discrimination**

To state a prima facie case of age discrimination, Mr. Hamilton must show that he (1) is a member of a protected class (here, that he was at least 40 years old ); (2) was performing his job satisfactorily; (3) was discharged; and (4) either was replaced by a substantially younger employee with equal or lesser qualifications or was discharged under circumstances giving rise to an inference of discrimination. *See Nesbit*, 994 F.2d at 704. The proof necessary for a plaintiff to establish a prima facie case is "minimal" and need not even rise to the level of a preponderance of the evidence. *See Avila v. Continental Airlines*, 165 Cal. App. 4th, 1237, 1246 (2008) (citing *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

RadioShack argues that Hamilton's age discrimination claim fails because Hamilton cannot establish a prima facie case. *See* Mot., ECF No. 95 at 16. RadioShack does not dispute that Hamilton was at least 40 and that he was performing his job satisfactorily for FEHA purposes when he was discharged. *See* Mot., ECF No. 95 at 16. Instead, RadioShack argues that Hamilton cannot establish the fourth element of a prima facie case. *Id.* Thus, the issue is whether Hamilton has presented evidence that he was replaced by a substantially younger employee with equal or inferior qualifications or that he was discharged under other circumstances giving rise to an inference that RadioShack harbored discriminatory intent. *Id.*

a. Hamilton's Replacement Was Substantially Younger

Hamilton contends that he has met his initial burden of showing a prima facie case of age discrimination because his short- and long-term replacements were substantially younger. Opp'n, ECF No. 103 at 9. Hamilton was 57 years old when he was fired on June 10, 2010. *See* JMF 2, 20. His immediate replacement was eight years younger. Mot., ECF No. 95 at 16. RadioShack disputes

UNITED STATES DISTRICT COURT
For the Northern District of California

that the age difference between Hamilton and his replacement was legally sufficient to establish a prima facie case of age discrimination.  Mot., ECF No. 95 at 16 (*relying on Reese v. Micro Dental Labs.* No. C 06-5873 SBA, 2007 WL 294548 (N.D. Cal. Oct. 10, 2007), *aff'd.* 323 F. App'x 594 (9th Cir. 2009); *Grosjean v. First Energy Corp.*, 349 F.3d 332 (6th Cir. 2003)).  Hamilton responds that controlling Ninth Circuit precedent establishes that a five-year age difference is sufficient to establish a prima facie case of age discrimination.  Opp'n, ECF No. 103 at 10.

The court finds that RadioShack's reliance on *Reese* is misplaced; there, the court did not hold, as RadioShack claims, that an eight-year age difference when both employees are over 40 is legally insufficient to establish a prima facie case of age discrimination.  Instead, Reese failed to establish a prima facie case because he was not replaced, his position was eliminated, and the workers who absorbed his job were both older and younger.  *Reese*, 2007 WL 294548, at *4.  Hamilton cites more persuasive cases.  *See Douglas v. Anderson*, 656 F.2d 528, 533 (9th Cir. 1981) (prima facie case established where replacement was five years younger than plaintiff); *Harris v. Potter*, No. C00-4688 BZ, 2002 WL 31298852, at *3 (N.D. Cal. Oct. 8, 2002) (relying on *Douglas* and finding an eight-year age difference substantial, though ultimately ruling for defendant); *Hersant v. Dept. of Soc. Servs.*, 57 Cal. App. 4th 997, 1006 (1997) (seven-year age difference "could reasonably be described as 'significant'").  While *Grosjean v. First Energy Corp.* does state that "[t]he overwhelming body of cases in most circuits has held that age differences of less than ten years are not significant enough to make out the fourth part of the age discrimination prima facie case," it also notes that "[t]he Ninth Circuit has not settled on a standard for substantial age difference and its case law is accordingly inconsistent."  349 F.3d 332, 338-39 (6th Cir. 2003) (collecting cases).  And, as Hamilton points out, that court still found a six-year age difference significant.  *Id.* at 340; Opp'n, ECF No. 103 at 11.

The court concludes that – under the circumstances here – there is at least a triable issue of fact that the age difference between Hamilton and his replacement was substantial.[6]

---

[6] The court notes that Hamilton's pointing to his 23-year-old ultimate replacement does not affect the court's outcome here.  *See* Opp'n, ECF No. 103 at 10 (citing Ocampo Dep., ECF No. 104-2 at 18, 23, 28, 42).  Hamilton relies on *Bounanoma v. Sierra Pacific Power Co.*, where the court

UNITED STATES DISTRICT COURT
For the Northern District of California

b.  <u>The Circumstances of Termination Permit an Inference of Discrimination</u>

Other circumstances also support an inference of discrimination (even assuming the age difference was insubstantial).  Hamilton offers both Aybef's age-related and other derogatory comments (see above) and statistical evidence suggesting bias against older workers.  RadioShack counters that only Ocampo and Schrader were involved in the termination decision, neither made derogatory comments, "Aybef had nothing whatsoever to do with Ocampo's decision to terminate Hamilton," and Aybef's comment is insufficient to raise an inference of age discrimination.  Mot., ECF No. 95 at 16-17; Reply, ECF No. 107 at 6-7.  Also, it says that the statistical evidence is (essentially) unreliable.  Reply, ECF No. 107 at 6-7.

The court finds that RadioShack's conclusion that Aybef "had nothing whatsoever to do with" the decision to terminate Hamilton is only partially supported by undisputed facts and that this determination is a fact question for the jury to decide.  *See* JMF 21.  And while RadioShack disputes the validity of Hamilton's statistical evidence, *see* Reply, ECF No. 107 at 6, the court finds it sufficient to satisfy the "minimal" burden of establishing a prima facie case.

More specifically to the role of Mr. Aybef, the court does not agree with RadioShack that his remark was a stray comment that is insufficient to establish age discrimination.  As RadioShack acknowledges, and as discussed below in the pretext section, a stray remark that alone would not be enough can be coupled with other evidence and defeat a summary judgment motion.  Mot., ECF No. 95 at 21 (quoting *Reid v. Google*, 50 Cal. 4th 512, 541-42 (2010)).  The court is relying not only on that comment but also on other evidence (as summarized in this section and the section on pretext).

As to Aybef's lack of involvement in the ultimate decision to fire Hamilton, still, the court's view is that the facts are sufficiently muddled that it is a fact question for the jury.  Among other

found circumstantial evidence supporting an inference of discrimination by the plaintiff's replacement's being replaced by an even younger employee.  325 F. App'x 542, 545 (9th Cir. 2009).  But here, it looks like Hamilton's replacement was not replaced and instead was transferred to a different store as manager.  *See* Ocampo Dep., ECF No. 104-2 at 42.

RadioShack objects to this testimony as irrelevant, as inadmissible character evidence, or as evidence of other acts.  *See* Reply, ECF No. 108 at 19.  Because the court does not rely on this evidence, RadioShack's objections to this testimony are overruled as moot.

UNITED STATES DISTRICT COURT
For the Northern District of California

things, Ocampo knew Aybef thought she should fire Hamilton, he was the manager for one of the two "insubordination" incidents, and she said that he influenced her decision making. Ocampo Dep. 24-26[7], 35-37, 225-226; *see Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007) (cat's paw theory; a subordinate's bias can be imputed to an "independent" decision maker who makes an adverse employment decision based on the influence of or involvement by the biased subordinate). Hamilton's evidence gives rise to a reasonable inference (at least to get him over the summary judgment hurdle) that Aybef "contaminated the decisionmaking process." *See Cafasso v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047 (9th Cir. 2011).[8] Also, Hamilton relies not just on

---

[7] RadioShack objects to Ocampo Dep. 23:24-24:7 as omitting the corrected version of the testimony at issue. *See* Reply at 19. If requested during the deposition, the deponent must be allowed 30 days after the transcript becomes available to review the transcript, make changes in form or substance of the testimony, and sign a statement listing the changes and the reasons for making them. Fed. R. Civ. P. 30(e)(1). RadioShack refers to the deposition corrections contained in a January 25, 2012 letter sent by Plaintiff's counsel to the reporter who transcribed Ocampo's November 18, 2011 deposition. *See* ECF No. 108-2 at 26-27. This letter, however, was signed by RadioShack's counsel, not Ocampo, does not provide the reasons for the changes indicated, and may not have been timely. *Id.*; *see also,* Ocampo Dep. Reporter's Certificate, ECF No. 108-2 at 15 (deposition certified on December 18, 2011 – more than 30 days prior to RadioShack's letter). The court, therefore, overrules RadioShack's objection and need not reach its substantive concerns about what appears to be an attempt to rewrite harmful deposition testimony.

[8] In *Cafasso*, the plaintiff, Mary Cafasso, alleged that her former employer, General Dynamics C4 Systems ("GDC4S"), defrauded the government by withholding disclosure of new inventions which, GDC4S had agreed by contract, the government had rights to use and license. *Id.* at 1051-52. *Cafasso* discovered the alleged fraud and made repeated inquiries and requests for internal audits. *Id.* at 1052. She claimed that as a result of her inquiries and requests, GDC4S retaliated against her by eliminating her department and position. *Id.* Christopher Marzilli was the GDC4S official who eliminated her department and position. *Id.* at 1060.

On appeal, the Ninth Circuit noted that "[t]he only evidentiary support [Cafasso] offers is first, the fact that some GDC4S officials who were in a position to influence Marzilli knew of her ATIRP-related inquiries and requests, and second, the cryptic statement of a coworker that unspecified "people" had, for unknown reasons, "poisoned the water," "gotten to Chris Marzilli," and "placed a cloak of poison over [Cafasso's] office with Chris Marzilli." *Id.* Moreover, Christopher Marzilli testified that he did not know of Cafasso's inquiries and requests at the time of his allegedly retaliatory decision, and Cafasso admitted in deposition that she had no reason to disbelieve Marzilli's account. *Id.* at 1060.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Aybef's bias but on Ocampo's own bias as revealed by the statistical evaluation of her

2    decisionmaking.  *See* Opp'n at 11-12 (citing Lepowsky Report, ECF No. 104-5).

3        Other evidence relevant to the court's determination that Hamilton established his prima facie

4    case includes the two CARs (April 20 and 21) and the metadata.  As summarized in the facts section,

5    Hamilton points to other discrepancies in Ocampo's testimony about what she decided and when

6    (including his pointing to her e-mail on May 8 to Rosenberg).  There also is Hamilton's description

7    (supported by sales associate Savannah Breese) about what happened in the store on April 20 (and

8    the court views that in the context of his 27-year tenure at RadioShack). Hamilton Dep. 133-169;

9    Breese Dep. 114-151, ECF No. 104-3 at 33-46.  And whatever the merits ultimately are to

10   RadioShack's challenges to the statistical evidence, the court finds it – together with all the other

11   evidence – sufficient to establish a prima facie case of discrimination.

12   **2.  Whether Hamilton Has Shown That RadioShack's Articulated Legitimate,**

13   **Nondiscriminatory Reason Was a Pretext for Discrimination**

14       If a plaintiff establishes a prima facie case, the burden of production shifts to the employer to

15   articulate a legitimate, nondiscriminatory business reason for the alleged action.  *See Guz v. Bechtel*

16   *National, Inc.*, 24 Cal. 4th 317, 355-56 (2000).  If the employer does so, the presumption of

17   discrimination disappears and the plaintiff must show that the articulated reason is pretextual,

18

19           "This evidence, without more," the Ninth Circuit concluded, "is not enough to sustain

20   Cafasso's burden at summary judgment."  *Id.* at 1061.  It explained:

21           To prove this theory at trial, Cafasso would have to establish that one of Marzilli's

22       subordinates, in response to Cafasso's protected activity, "set[ ] in motion" Marzilli's
         decision to eliminate Cafasso's department and job, and that the subordinate

23       "influenced or was involved in the decision or decisionmaking process."  *Poland*, 494
         F.3d at 1182.  The evidence adduced by Cafasso establishes only that this set of

24       events could conceivably have occurred; it does not give rise to a reasonable

25       inference that it did in fact occur.  To find liability on this evidence would require
         undue speculation.  To survive summary judgment, a plaintiff must set forth

26       non-speculative evidence of specific facts, not sweeping conclusory allegations.
         *Mackie v. Rieser*, 296 F.3d 909, 915–16 (9th Cir. 2002); *Leer v. Murphy*, 844 F.2d

27       628, 634 (9th Cir. 1988).

28   *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

1   "'either directly by persuading a discriminatory reason more likely motivated the employer or

2   indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Texas*

3   *Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1982); *see also Arteaga v. Brink's Inc.*,

4   163 Cal. App. 4th 327, 343 (2008).  At all times, the ultimate burden of persuading the trier of fact

5   that the employer intentionally discriminated remains with the plaintiff.  *See Reeves v. Sanderson*

6   *Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

7        Hamilton established a prima facie case of discrimination, but RadioShack articulated a

8   legitimate, nondiscriminatory reason for firing him.  *See Guz*, 24 Cal. 4th at 355-56.  RadioShack

9   relies on Ocampo's deposition testimony that she terminated Hamilton for insubordination.  *See*

10  Motion at 18 (citing Ocampo's Declarations and deposition testimony).  Hamilton does not dispute

11  that RadioShack has met its burden, and the court agrees.

12       Hamilton thus must show that RadioShack's articulated reason is a pretext for discrimination.  A

13  plaintiff can prove pretext either "(1) indirectly, by showing that the employer's proffered

14  explanation is unworthy of credence because it is internally inconsistent or otherwise not

15  believable, or (2) directly, by showing that unlawful discrimination more likely motivated the

16  employer."  *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1127 (9th Cir. 2000).

17       Direct evidence "is evidence which, if believed, proves the fact of discriminatory animus without

18  inference or presumption," and it "typically consists of clearly sexist, racist, or similarly

19  discriminatory statements or actions by the employer."  *Coghlan v. Am. Seafoods Co.*, 413 F.3d

20  1090, 1094-95 (9th Cir. 2005).  Very little direct evidence is required to raise a genuine issue of

21  material fact.  *Id.* at 1095.

22       Indirect, circumstantial evidence must be "specific and substantial" to defeat summary judgment.

23  *Id.; Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2004).  And "[a] 'plaintiff

24  cannot create a genuine issue of pretext to survive a motion for summary judgment by relying solely

25  on unsupported speculations and allegations of discriminatory intent.'"  *Jackson v. Geithner*, No.

26  CV F 11-0055 LJO SKO, 2011 U.S. Dist. LEXIS 59483, at *34 (E.D. Cal. Jun. 3, 2011) (quoting

27  *Crawford v. MCI Worldcom Communications, Inc.*, 167 F. Supp. 2d 1128, 115 (S.D. Cal. 2001)).

28       The crux of RadioShack's argument is its contention that Hamilton's evidence of pretext is

UNITED STATES DISTRICT COURT
For the Northern District of California

1    insufficient because it does not have "anything to do with the stated reason for termination."  Reply,

2    ECF No. 107 at 7.  RadioShack argues that a plaintiff cannot defeat summary judgment by attacking

3    a manager's general credibility and must show evidence "not that Ocampo or Aybef are somehow

4    not credible in a general sense but that *they were motivated by age bias or an intent to unlawfully*

5    *retaliate*."  *Id.* at 8-9.  The court finds that there are triable issues of fact as to whether Ocampo

6    and/or Aybef possessed discriminatory intent such that a reasonable jury could find that Ocampo's

7    stated reason was pretextual.

8        First, as Hamilton argues, a reasonable jury could find that Ocampo's claim – that Hamilton was

9    terminated for insubordination arising in part from the April 20, 2010 incident – lacks credibility.

10   Opp'n, ECF No. 103 at 14.  Hamilton argues that he was not insubordinate when Aybef confronted

11   him on April 20, 2010, and Ocampo and Aybef lied when they claimed he was.  *See id.*  Hamilton

12   testified that Aybef was physically threatening and angry, and co-worker Savanna Breese confirmed

13   that account.  *Id.* (citing Hamilton Dep. 138:20-139:16; Breese Dep. 114-125).  Aybef and Ocampo

14   deny improper conduct, but this is a fact issue.  Aybef Dep. 87:9-20; Ocampo Dep. 341:20-24.

15       Second, as to the assertion that Aybef lied, Hamilton argues that Aybef's actions undercut the

16   credibility of his and Ocampo's testimony.  Reply, ECF No. 103 at 14.  Aybef says that he contacted

17   Human Resources the day after the incident to give his side even before he knew that Hamilton had

18   filed a complaint.  *Id.* (citing Aybef Dep., ECF No. 104-3 at 56-57).  That, Hamilton argues, is part

19   of conduct supporting a conclusion that Aybef and Ocampo lied to cover up Aybef's improper

20   conduct and allegedly discriminatory remark.  *Id.*  The court  appreciates RadioShack argument that

21   Aybef's call to HR is not improper because Aybef called HR to report that Hamilton had acted

22   inappropriately and would be subjected to discipline.  Reply, ECF No. 107 at 14.  But at best, that is

23   an inference.  Such weighing of facts and inferences is for the jury.

24       Third, as to the assertion that Ocampo lied, Hamilton points to evidence that Ocampo altered the

25   CAR to make it look like she drafted it before she learned that Hamilton had complained to HR.  *See*

26   Opp'n, ECF No. 103 at 14 (citing Krone Report, ECF No. 104-5 at 56).  The metadata analysis

27   showing that Ocampo last saved the file on April 21 at 10 a.m. supports that conclusion.  *Id.*

28   RadioShack argues that this is a "red herring" because Hamilton did not allege that Ocampo issued

UNITED STATES DISTRICT COURT
For the Northern District of California

1    the CAR in retaliation, and it says that Hamilton's interpretation of the metadata analysis comports

2    with its view that Ocampo may have simply saved the CAR on April 21 (as opposed to creating a

3    backdated version). Reply, ECF No. 107 at 14. Again, this is a fact issue.

4         Fourth, Hamilton argues that Ocampo's May 8 e-mail to Rosenberg shows that she planned to

5    replace Hamilton by then, and that contradicts her deposition testimony that she did not reach that

6    decision until June. Opp'n, ECF No. 103 at 15 (citing Ocampo Dep., ECF Nos. 104-1 at 8-9 and

7    104-6 at 28). RadioShack counters that the e-mail only shows store managers with recent corrective

8    action. Viewed in the context of the other challenges to credibility, this is a fact issue.

9         Fifth, Hamilton argues that the evidence supports a conclusion that Ocampo wanted to fire

10   Hamilton to please Aybef and help advance her own career. *See* Opp'n, ECF No. 103 at 16.

11   According to Hamilton, Ocampo knew Aybef thought she should fire Hamilton, and she said that he

12   influenced her decision making. *Id.* at 16; Ocampo Dep. 25-26, 35-37; 224:2-225:9 ("Q. did you

13   have some concern that it was expected of you to terminate Mr. Hamilton's employment in order to

14   make Mr. Aybef happy? A. Yes. I had concern that that was an expectation of me.").[9] Ocampo

15   wanted to move up in RadioShack's ranks and knew that Aybef had the ear of Greg Pattakos, an

16   executive with important connections in RadioShack's hierarchy. Ocampo Dep. 350:4-351:3

17   Several months after terminating Hamilton, Ocampo spoke briefly with Aybef at a conference. *Id.*

18   344-348. Although they spoke for only one or two minutes, Ocampo mentioned that Hamilton was

19   no longer employed at RadioShack. *Id.* 346:7-348:6. She also wanted to reduce labor costs and said

20   that she believed that Hamilton's salary was higher than other managers (including his ultimate

21   replacement). Ocampo Dep. 33-35. As to the last point, RadioShack claims that Hamilton's cost-

22   cutting theory is contradicted by undisputed evidence including that Ocampo did not fire a store

23   manager who is older and more highly paid than Hamilton, that compensation was based on factors

24

---

25        [9] Although not cited by Hamilton, the court's also notes that Ocampo testified that she was
     concerned that Aybef might look upon her less favorably for not firing Hamilton:

26        Q.  Okay.  Did you have any concern that, if you did not fire Mr. Hamilton, that Basem
                might somehow not look upon you as favorably?
27
          A.  Absolutely.
28   Ocampo Dep. 225:23-226:1.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   other than age and seniority, and Hamilton actually was not that highly paid.  Reply at 15-16 (citing

2   Ocampo Decl., ECF No. 97-1, ¶¶ 21-22, 30-31).  But what Ocampo believed is relevant, and she

3   testified that she believed that she replaced Hamilton with a lower-paid manager.  Ocampo Dep.

4   181:7-20, 183:7-17.

5        Sixth, Aybef made an allegedly ageist statement, and Hamilton also points to statistical evidence

6   showing Ocampo's own bias.  RadioShack disputes that Aybef made the statement but argues that it

7   is a stray remark that alone is not enough to establish pretext.  *See* Reply at 9.  It also argues that

8   Aybef was not the decision maker.  *Id.* at 9-11.  But as set forth in the "prima facie case" section,

9   the court considers the remark in the context of the other evidence, and Aybef's role and influence

10  are fact issues.  As to the statistical evidence, Hamilton's expert says that it shows a statistically-

11  significant disparity in Ocampo's hiring and promotion practices and in her qualitative assessments

12  of older employees.  *See* Lepowsky Report, ECF No. 104-5 at 5.  Radioshack argues that the

13  statistical evidence is based on too small a sample size and that Hamilton's expert used an invalid

14  methodology.  *See* Reply at 12-13.  But RadioShack's challenge to the expert's report is primarily

15  based on a few cases cited parenthetically.  *See id.*  The court is not prepared to disregard Hamilton's

16  expert report at summary judgment without a more robust evidentiary challenge.

17       In sum, the court finds that Hamilton provided some direct evidence and "specific and

18  substantial" indirect evidence of pretext.  *See Coghlan*, 413 F.3d at 1094-95.  The court thus denies

19  RadioShack's motion for summary judgment on the age discrimination claim.

20  **B.  Retaliation**

21       To establish a prima facie case of retaliation under FEHA, a plaintiff must show the following:

22  (1) he engaged in a protected activity; (2) the employer subjected him to an adverse employment

23  action; and (3) there was a causal link between the protected activity and the employer's action.  *See,*

24  *e.g., Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000);

25  *Morgan v. Regents of the Univ. of California*, 88 Cal. App. 4th 52, 69 (2000).

26       RadioShack argues that Hamilton's claim for retaliation fails because Hamilton cannot raise a

27  triable issue fact that a causal link exists.  *See* Mot., ECF No. 95 at 24.  RadioShack points out that

28  Hamilton testified that he had no reason to believe that he was fired for complaining to human

1    resources other than the fact that he was terminated just a couple of months after filing his

2    complaint.  *See id.* (quoting Hamilton Dep., ECF No. 97-10 at 22).  Hamilton counters  that much of

3    his evidence was uncovered after his November 2011 deposition, rendering RadioShack's reliance

4    on this statement inapposite.  Opp'n, ECF No. 103 at 19 n.9.  But RadioShack also says that

5    temporal proximity of the adverse action to the protected activity is not enough to show pretext.

6    Mot., ECF No. 95 at 26 (analyzing *Reese*, 2007 WL 294548, where the court found that "temporal

7    proximity, even coupled with the speculative suggestion of an 'ulterior motive,' was insufficient

8    evidence of pretext and could not defeat summary judgment").

9        Temporal proximity alone might not establish pretext – as discussed in *Reese*.  But that is not to

10    say that timing is irrelevant because protected activity, knowledge of that activity, and an adverse

11    employment action following closely on the heels of the protected activity can establish causation.

12    In *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 802, 812 (9th Cir. 2002), for example, the Ninth

13    Circuit said,"[I]n some cases, causation can be inferred from timing alone where an adverse

14    employment action follows on the heels of protected activity."  *Id.* (emphasis added) (citing

15    *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000); *Miller*

16    *v. Fairchild Indus.*, 885 F.2d 498, 505 (9th Cir.1989); *Yartzoff*, 809 F.2d at 1376).  And a review of

17    the cases *Villiarimo* cites for this point—*Passantino*, *Miller*, and *Yartzoff*—shows that close temporal

18    proximity must be paired with an employer's knowledge of the plaintiff's protected activities to

19    establish causation.  *See Passantino*, 212 F.3d at 507 (plaintiff voiced sex discrimination-related

20    complaints to her supervisor, who thereafter gave plaintiff lower performance evaluations and

21    subsequently passed her over for promotion); *Miller*, 885 F.2d at 505 (plaintiffs Lewis and Miller

22    were laid off only 59 days and 42 days, respectively, after EEOC hearings, but the record contained

23    evidence that the Fairchild management personnel who participated in the lay off decisions were

24    aware of plaintiffs' EEOC charges, had attended the EEOC fact-finding conference, and were the

25    very people whose actions had prompted the plaintiffs' complaints); *Yartzoff* ("Causation sufficient

26    to establish the third element of the prima facie case may be inferred from circumstantial evidence,

27    such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity

28    in time between the protected action and the allegedly retaliatory employment decision."; record

UNITED STATES DISTRICT COURT
For the Northern District of California

1    contained evidence that plaintiff's supervisors—who issued a sub-average performance rating

2    approximately three weeks after the plaintiff, the supervisors, and the EEO counselor met to discuss

3    the plaintiff's complaints—were aware of his Title VII complaints and of his participation in

4    administrative investigations).  Of course, it makes sense that, to prove causation, a plaintiff must be

5    able to show that the person who allegedly retaliated against an employee for engaging in protected

6    activity must also have known that the employee engaged in the protected activity.  *See Blanchard v.*

7    *Lahood*, 461 Fed. App'x 542, 544, (9th Cir. 2011) ("[I]t is causation, and not temporal proximity

8    alone, which is an element of a plaintiff's retaliation claim") (citing *Porter v. California Dept. of*

9    *Corrections*, 419 F.3d 885, 894-95 (9th Cir. 2005)); *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796

10   (9th Cir. 1982) ("Essential to a causal link is evidence that the employer was aware that the plaintiff

11   had engaged in the protected activity.") (citing *Gunther v. County of Washington*, 623 F.2d 1303,

12   1316 (9th Cir. 1979), *aff'd.*, 452 U.S. 161 (1981); *Aguirre v. Chula Vista Sanitary Serv.*, 542 F.2d

13   779, 781 (9th Cir. 1976)).

14       Here, as described in the preceding section, Hamilton provided evidence suggesting that Ocampo

15   and Aybef knew of his protected activity, and he has other evidence of pretext.  The court denies

16   RadioShack's motion for summary judgment on the retaliation claim.

17   **C.   Third and Fourth Claims:  Failure to Prevent Discrimination and Retaliation Under the**

18       **FEHA and Wrongful Termination in Violation of Public Policy**

19       RadioShack argues that Hamilton's claims for failure to prevent discrimination and retaliation[10]

20   and wrongful termination in violation of public policy fail for the same reasons that his first two

21   claims fail.  Because the court holds that the first two claims survive summary judgment, it holds

22   that these claims do, too.

23

24       [10]  RadioShack also argues that FEHA does not provide independent causes of action for

25   failure to prevent discrimination and retaliation.  Motion, ECF No. 95 at 27 n.10 (citing absence of
     language regarding failure to prevent retaliation in Cal. Gov. Code, § 12940(k)).  Hamilton cites

26   cases and a model jury instruction that show that despite the vague statutory language, the claims do

27   exist under section 12940(k).  Opp'n, ECF No. 103 at 20 (citing *Taylor v. City of Los Angeles Dept.*
     *of Water & Power*, 144 Cal. App. 4th 1216, 1240 (2006), and Judicial Counsel of California Civil

28   Jury Instruction 2527, "Failure to Prevent Harassment, Discrimination, or Retaliation").

### D. **Punitive Damages**

"[I]n a civil action under the FEHA, all relief generally available in noncontractual actions, including punitive damages, may be obtained." *Erdmann v. Tranquility, Inc.*, 155 F. Supp. 2d 1152, 1167 (N.D. Cal. 2001) (quoting *Commodore Home Sys., Inc. v. Superior Court,* 32 Cal. 3d 211, 221 (1982) (quotation marks omitted)). Thus, punitive damages are available under California Civil Code § 3294, which provides for punitive damages "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." "Malice" is "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civ. Code §3294(c)(1). "Oppression" is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." *Id.* § 3294(c)(2).

Under California Civil Code section 3294(b),

> An employer shall not be liable for [punitive] damages pursuant to subdivision (a) [providing for damages based on oppression, fraud, or malice], based on acts of an employee of the employer unless the employer had advance knowledge of the unfitness of the employee and employed him with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director or managing agent of the corporation.

On summary judgment, the plaintiff need not prove his case, but the higher clear and convincing evidentiary standard must still be taken into account because the plaintiff ultimately must be able to meet that standard. *See Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1053 (2009). Still, summary judgment "on the issue of punitive damages is proper" only "when no reasonable jury could find the plaintiff's evidence to be clear and convincing proof of malice, fraud or oppression." *Id.* (citing *Hoch v. Allied–Signal, Inc.*, 24 Cal. App. 4th 48, 60-61 (1994)).

RadioShack argues that Hamilton cannot show that Ocampo, Schrader, Smith, and Aybef were officers, directors, or managing agents of RadioShack. Mot. at 29-30. It also argues that Hamilton can show no evidence of malice or oppression. *Id.* at 29.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

### 1.  Managing Agents

Hamilton argues malice only by Ocampo, Aybef, and Greg Pattakos, RadioShack's vice-president for operations.  Opp'n at 20-26.

The "mere ability to hire and fire" employees does not render a supervisory employee a managing agent under section 3294(b).  *White v. Ultramar Inc.*, 21 Cal. 4th 563, 566 (1999). Instead, "managing agent" includes "only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy. *Id.* at 566-67.  The corporate policies must affect a substantial portion of the company and be the type likely to come to the attention of corporate leadership. *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 715 (2009).  "It is this sort of broad authority that justifies punishing an entire company for an otherwise isolated act of oppression, fraud, or malice." *Id.* (finding that an employee who managed four of a company's 20,000 employees was not a managing agent).  "The scope of a corporate employee's discretion and authority under our test is . . . a question of fact for decision on a case-by-case basis." *White*, 21 Cal. 4th at 567.

Hamilton compares the facts in this case to those of *White*, where the court found that a manager of eight retail convenience stores and approximately 65 employees and store managers was a managing agent for punitive damages purposes.  *See* Opp'n, ECF No. 103 at 25.  The allegation was that the manager fired White not for the reason she articulated (not paying for soda) but instead because he testified at an unemployment hearing of another employee.  *Id.*  The company argued that the manager was not a high-level manager and policy maker but instead was a local supervisor who needed next-level approval from the human resources manager and division manager to fire someone.  *Id.* at 580 (Mosk, J., concurring).  The *White* court was not persuaded by that testimony, noting the manager's importance to the overall business and the fact that her superiors delegated "most, if not all, of the responsibility of running these stores to her."  *Id.* at 577 (majority opinion) (noting that the fact that the manager consulted with HR before firing the plaintiff did not take away from her ability to act independently).  Because the manager had substantial leeway in running the stores and could hire and fire employees like the plaintiff, the court concluded that she "exercised substantial discretionary authority over decisions that ultimately determined corporate policy in a

most crucial aspect of [the company's] . . . business." *Id.*; see also *Egan* v. *Mutual of Omaha*, 24 Cal. 3d 809, 815-17, 822-23 (Cal. 1979) (punitive damages imposed on defendant insurer because non-managerial employees who were not involved in "high-level policy making" had broad discretion in deciding to dispose of insureds' claims, which justified imputing liability to employer for employees' decisions in maliciously denying claims); *Argarwal v. Johnson*, 25 Cal. 3d 932, 939, 952 (Cal. 1979) (punitive damages based on malicious acts of manager and his assistant imputed to 5,000-employee company despite the fact the manager supervised only 20-25 employees and was lower in corporate hierarchy than others involved in decision to terminate plaintiff, because manager and assistant had the most immediate control over the termination decision).

Similarly, here, Ocampo managed 22 stores, 22 store managers, and approximately 110 employees at any given time. Ocampo Decl., ECF No. 97-1, ¶ 24. Ocampo had the authority to terminate employees, including store managers, without consulting anyone else. Ocampo Dep. 24:20-25:3. She could promote employees to store manager and could set their salaries, within a given range. *Id.* 182:17-183:6.

During his temporary appointment as RSD for San Francisco and three other Northern California districts, Aybef supervised 4 District Managers, and approximately 78 store managers and 410 employees. JMF 26. Hamilton also points out that Ocampo and Aybef both attended RadioShack's annual leadership conference, which was limited to the 300 most senior managers of RadioShack's 35,000 employees. Opp'n at 25 (citing Ocampo Dep. 344:10-345:13). And Aybef certainly had the authority to fire Hamilton–he threatened to do just that. Ocampo and Aybef supervised even more employees than the supervisors in *White* and *Egan*, and had plenary authority over personnel decisions. RadioShack responds that Ocampo and Aybef had no discretion "with respect to RadioShack's formal corporate policies." Reply at 16-17 (citing Aybef Decl. ¶¶ 13-16, ECF No. 97-2 at 6-7; Ocampo Decl. ¶¶ 24-27, ECF No. 97-1 at 9-10). But the legal conclusions in Ocampo and Aybef's declarations are at odds with the deposition testimony cited by Hamilton.

The court concludes that Hamilton raises a triable issue regarding whether he can show by clear and convincing evidence that Ocampo and Aybef were managing agents of RadioShack. The third person at issue – Greg Pattakos – was RadioShack's vice president for Operations for the Central

1  Division and was a managing agent (and RadioShack does not dispute that).  The court thus analyzes

2  the specific evidence regarding Ocampo, Aybef, and Pattakos.

3  **2.  Evidence of Malice and Oppression**

4      a.  _Ocampo_

5      Turning to the question of scienter, Hamilton argues that Ocampo acted maliciously or in

6  conscious disregard for Hamilton's rights.  Opp'n, ECF No. 103 at 26.  Specifically, Hamilton

7  claims that Ocampo intentionally retaliated against him for having made a formal complaint.  _Id._ at

8  26.  Hamilton also argues that he has proffered evidence "from which a jury could conclude that

9  Ocampo, in an effort to protect herself and Aybef, lied to Human Resources with regard to the

10  events of April 20, 2010.  _Id._  Finally, Hamilton argues that there is sufficient evidence to support a

11  jury finding that Ocampo fabricated her claim that Hamilton was insubordinate in order to terminate

12  his employment.  _Id._  The court finds that Hamilton's allegations are sufficiently supported by the

13  facts discussed above, and that a reasonable juror could find that they constituted clear and

14  convincing evidence of malicious retaliation.  Accordingly, the court denies RadioShack's motion

15  for summary judgment on this theory.

16      b.  _Aybef_

17      Hamilton also argues that a jury could conclude that "Aybef exerted influence over Ocampo such

18  that she was motivated to lie to the investigator and then retaliate against Hamilton by

19  manufacturing a reason for terminating him . . . ."  Opp'n, ECF No. 103 at 26.  RadioShack does not

20  specifically address Hamilton's punitive damage claim on this theory except to argue that Aybef is

21  not a managing agent.  _See_ Reply, ECF No. 107 at 16-17.  Nonetheless, the court is still persuaded

22  by RadioShack's argument that Hamilton lacks evidence of malice, oppression, or fraud on Aybef's

23  part.  _See_ Mot., ECF No. 95 at 28.  Hamilton's argument is that Aybef caused Ocampo to act

24  maliciously or in conscious disregard of Hamilton's rights.  Opp'n, ECF No. 103 at 26.  But

25  Hamilton really provides only evidence that Aybef influenced the decision and does not present

26  evidence of the same kinds of lies and conduct that might – if Ocampo is a managing agent –

27  establish malicious intent sufficient to support punitive damages.  Accordingly, the court GRANTS

28  RadioShack's motion for summary judgment to preclude punitive damages based on Aybef's

UNITED STATES DISTRICT COURT
For the Northern District of California

1   conduct.

2          c.  *Pattakos*

3          Hamilton argues that Pattakos is liable because he consciously disregarded Aybef's conduct, and

4   he ratified Aybef's bad behavior by promoting him.  *See* Opp'n at 20-24.  From February 2008 until

5   late 2010, Pattakos was Vice President of Operations for RadioShack's Central Division.  *Id.*  In that

6   position, Pattakos was responsible for 15,000 employees, was an officer of the company and was a

7   member of RadioShack's Executive Committee.  *Id.* at 7:17-23, 17:19-18:3, (15000) (officer was

8   VP+).  He was also Aybef's supervisor.  *See id.* 72:1-4.

9          Pattakos conducted Aybef's annual evaluations from 2008 through 2010.  *Id.* 70:17-71:17, 72:1-

10  72:19.  As part of an annual evaluation, Pattakos would typically ask HR whether there were any

11  employee relations issues he should know about and HR would generally make him aware of the

12  substance of any complaints.  *Id.* 73:13-74:22.  The record is not clear whether HR would tell

13  Pattakos about all complaints, or just those that were substantiated.  *See id.* 149:4-10, 154:1-22.

14  Nonetheless, Pattakos was aware that a number of employees had complained to HR about Aybef's

15  allegedly abusive conduct.  *Id.* 49:3-50:25, 122:3-9, 148:18-149:10, 154:1-22, 198:9-199:4.  The

16  record does not indicate that any of the complaints accused Aybef of age discrimination, though one

17  female employee accused Aybef of creating a "hostile work environment."  *Id.* 173:5-10.  Pattakos

18  explained that he expected there to be some complaints about Aybef given his position in the

19  company and the fact that Aybef was trying to institute changes to RadioShack operations.  *Id.* 49:3-

20  50:25, 172:3-13.

21         In 2010, Pattakos was promoted to RadioShack's Vice President for Operations, a position that

22  reported directly to the CEO.  *Id.* 15:6-16:14, 17:1-16.  In January 2011, he made the final decision

23  to promote Aybef from Regional Sales Director to Divisional Director–one of only six in the

24  company.  *Id.* at 12:16-22, 16:4-14, 18:25-19:9, 23:15-22, 187:22-188:2.  When deciding whether to

25  promote an employee, Pattakos testified that he would speak to HR and expected them to inform him

26  of relevant complaints against the candidate.  *Id.* 27:23-33:3.  While there were a "handful" of

27  complaints about Aybef, Pattakos was very happy with Aybef's performance.  *Id.* 84:4-6, 198:9-

28  199:4.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Hamilton's main argument is that Pattakos knew about complaints against Aybef that accused

2  Aybef of abusive conduct and did not do anything about them.  Opp'n at 22-23.  The record does

3  establish that Pattakos knew about complaints against Aybef.  Pattakos Dep. 49:3-50:25.  It is not

4  clear from the record whether complaints were substantiated.

5    It is a close call whether Pattakos had actual knowledge that Aybef was likely to inflict injury

6  and acted with a conscious disregard for the employees Aybef supervised.  On balance, given

7  Pattakos's awareness of multiple complaints about Aybef and failure to act, the court "cannot say at

8  this stage of the proceeding, where it is required to draw all reasonable inferences in favor of the

9  plaintiff, that no reasonable jury could conclude based upon the evidence presented by Plaintiff" that

10  Pattakos's "acts were despicable and taken in conscious disregard of Plaintiff's rights." *Erdmann*,

11  155 F. Supp. 2d at 1167.  The court declines to hold that Hamilton is barred from seeking punitive

12  damages on his state law claims.

13    On the other hand, the court does not find persuasive Hamilton's theory that Pattakos ratified

14  Aybef's conduct by promoting him.  The record does not establish that Pattakos was aware that any

15  of the complaints against Aybef were substantiated.  Without actual knowledge of wrongful conduct,

16  Hamilton's ratification theory fails.  The court thus grants RadioShack summary judgment to

17  preclude Hamilton's seeking punitive damages on this theory.

18                                  **V.  CONCLUSION**

19
20    The court denies RadioShack's summary judgment motion on all grounds except that it

21  precludes Hamilton from seeking punitive damages against (A) Aybef and (B) Pattakos on a theory

22  of ratification.  The court denies RadioShack's motion to strike.

23    This disposes of ECF Nos. 95 and 109.

24    **IT IS SO ORDERED.**

25  Dated: September 28, 2012

26                                  LAUREL BEELER

27                                  United States Magistrate Judge

28